Filed 2/9/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIUS W. LEWIS,<br><br>    Defendant and Appellant. | A134995, A137530<br><br>(City and County of San Francisco<br>Super. Ct. No. 2344913, 206826) |

Defendant Julius W. Lewis was convicted by a jury of five counts of lewd and lascivious acts on a child (Pen. Code, § 288, subd. (a)), and was sentenced to 29 years to life in prison.[1]  One count involved conduct with Angelina B. in 2006 or 2007, and the other four involved conduct with Teresa C. in August, September, and October of 1989. Lewis was ordered to pay over $1.5 million in victim restitution to Angelina and Teresa. He disputes the convictions and the restitution awards.

We affirm the convictions.  Lewis argues that the convictions as to Teresa must be reversed because they were barred by the statute of limitations, or because his right to due process was violated due to the delayed prosecution.  In the published portion of this opinion, we reject these arguments.

In the unpublished portion of this opinion, we reject Lewis's argument that the conviction as to Angelina must be reversed because the court erred when it excluded

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C, II.D, and II.E.

[1] Unless otherwise indicated, statutory references are to the Penal Code.

1

evidence that allegedly concerned her credibility. We also explain the reasons for our conclusions with respect to Lewis's arguments concerning restitution to the victims.

## I. BACKGROUND

A. <u>Angelina</u>

In October 2005, when Angelina B. was five years old, she was placed in foster care with Lewis's friend, Lynett Palmer. Palmer had four or five other foster children in her home. Lewis was living nearby with his wife, his daughters Monica and Melissa, and his sons, J.L and N.L. Angelina went to Lewis's home to play with his daughters, and Palmer left Angelina with Lewis when she ran errands and went to school and church.

Angelina testified that, on about four or five occasions, Lewis asked her to come into his bedroom, took off her pants, and started "humping" her, leaving "white stuff" on the bed. He also sucked on her breasts. In August 2007, Angelina told Palmer what Lewis had done. Palmer noticed a "small speckled circle" on Angelina's left breast, and reported Angelina's allegation to a foster care worker. In a 2007 forensic interview, Angelina said that Lewis put his private part in her private part.

B. <u>Teresa</u>

After Angelina disclosed her abuse, San Francisco police located Lewis's ex-wife in Texas, who reported that he had molested her daughter, Teresa C. Teresa was born in 1978, and lived in Texas until June or July of 1989, when she moved to San Francisco with her mother and Lewis. Teresa testified that Lewis began touching her breasts and between her legs when she was six or seven years old. When she was eight or nine, he began having sexual intercourse with her, progressing from once a month to a couple of times a week. He continued sexually abusing her one to three times a week in San Francisco in August, September, and October of 1989. She remembered that he had sexual intercourse with her on October 17, 1989, the day of the Loma Prieta earthquake.

After the earthquake they returned to Texas, where Lewis continued to molest her. In the last incident, when she was between 11 and 13 years old, he put a knife to her throat and raped her. She did not recall a medical examination in July of 1991 when she tested positive for gonorrhea, and did not remember testifying before a Texas grand jury.

2

C.  Other Victims

L.W., born in 1978, testified that Lewis sexually abused her from the time she was three until age eight or nine.  Lewis babysat her, and her family lived with his family for about a year.  When she was three, he touched her vagina and had her touch his penis.  When she was four, he digitally penetrated her vagina.  When she was five, he began having intercourse with her.  When she was seven, he began making her orally copulate him.

When Lewis learned that L.W. had told Teresa that she was going to report what he was doing, he twisted L.W.'s arm behind her back, put a gun to her head, and threatened to kill her and her mother if she told anyone what was happening.  L.W. witnessed Lewis have intercourse with Teresa, and saw him try to penetrate another girl named Sabrina with his penis.

Sabrina A., born in 1977, testified that she was molested by Lewis when she was seven and eight years old.  When her mother worked late, Sabrina stayed overnight at L.W.'s home, where Lewis was living.  Lewis touched her vagina and made her touch his penis five or six times over a three-month period.  He once tried, in L.W.'s presence, to penetrate Sabrina's vagina with his penis.  A couple of days later Sabrina told her mother that Lewis had molested her and L.W.

L.C., born in 1972, was Lewis's stepsister.  L.C. testified that Lewis often forced her to have intercourse when he was age 19 or 20 and she was age nine.  She eventually reported the abuse at school.

**II.  DISCUSSION**

A.  Statute of Limitations (Teresa)

Lewis contends that the court incorrectly instructed the jury on the statute of limitations applicable to the charges involving Teresa.

The statute of limitations for lewd and lascivious acts upon a minor under section 288 is six years.  (§ 800.)  Effective January 1, 1994, former section 803, subdivision (g)(1) provided that if the limitation period specified in section 800 had expired, "a criminal complaint may be filed within one year of the date of a report to *a law*

3

*enforcement agency* by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section . . . 288 . . . ." (Stats. 1993, ch. 390, §1, p. 2226; italics added.)  In 1997, section 803, subdivision (g)(1) was amended to allow the filing of a complaint by such a victim within one year of a report to "a *California* law enforcement agency."  (Stats. 1997, ch. 29, § 1, p.346; italics added.)  The 1997 language is currently in section 803, subdivision (f)(1).  (Stats. 2005, ch. 479, § 3, p. 3792.)

Lewis argues that he had evidence to support a finding that Teresa reported his California crimes to a Texas law enforcement agency in 1991, and that her report in Texas qualified as a report within the meaning of the 1994 version of section 803, subdivision (g)(1), because that version, unlike the one enacted in 1997, did not expressly require that the report be made to a *California* law enforcement agency.

Lewis presented evidence to the court that Teresa told a Texas physician in July 1991 that he had raped her the previous month, and that in September 1991 he was indicted by a Texas grand jury for raping her on or about June 22, 1991.  The charge was dismissed in 1992 when the prosecution lost contact with Teresa, and no other records concerning the charge were preserved.    Although he was indicted in Texas only for a single count of rape, Lewis postulates that Teresa might have reported other abuse in addition to the rape, including his molestations of her while they lived in California in 1989.  Lewis maintains that he should have been able to argue this point to the jury, and that if the jury found his California crimes were reported to Texas law enforcement in 1991, then prosecution for those crimes would have been barred by the statute of limitations.

The People argue that it would be entirely speculative to infer from the evidence Lewis cites that Teresa told Texas law enforcement about her molestations in California. For purposes of this opinion, we will assume that the evidence was sufficient to support such an inference, and that Lewis's offenses against Teresa could have been found to be time barred if his interpretation of the statute is correct.  An operative report to law enforcement in 1991, long before the running of the six-year statute, would not have

4

extended the 1995 deadline for prosecution of the 1989 crimes. "The effect of subdivision (g) is to permit prosecution of sexual offenses with a juvenile victim within six years of the offense or one year of the victim's report of the offense, whichever is later." (*People v. Vasquez* (2004) 118 Cal.App.4th 501, 503–505 [interpreting the 1997 version of § 803 subd. (g)(1), fn. omitted ].) If the statute of limitations expired in 1995, the deadline could not thereafter be extended without violating the prohibition against ex post facto laws. (*Stogner v. California* (2003) 539 U.S. 607, 609 [the ex post facto prohibition precludes resurrection of prosecutions that are time barred when the new law is enacted].)

The People argue that the 1997 amendment to section 803, subdivision (g)(1) expressly requiring a report to a "California" law enforcement agency did not change the law as Lewis claims, but merely clarified it. If the 1997 amendment simply clarified the 1994 law, then it could be applied without violating the ex post facto prohibition, and a Texas report would not have triggered the running of the statute's one-year period, even under the 1994 version. (See *Weaver v. Graham* (1981) 450 U.S. 24, 29 [to be ex post facto a criminal law must be retrospective]; *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [a statute that clarifies existing law does not operate retrospectively].)

The People also argue Lewis's interpretation of the 1997 amendment is "implausible." As the People put it in their brief: "According to appellant's construction, the Legislature in 1994 *intended* to start the statute of limitations running upon a report to law enforcement in *any* other state or country, and *intended* to impose an impossible duty on the local district attorneys to find, within one year, any national or international sexual assault reports that might have been made. Appellant's construction would also mean that the Legislature decided in 1997 that it no longer wanted to impose such a burden on local jurisdictions and modified the law accordingly."

The issue was litigated at trial and the court agreed with the People. The testimony showed that Teresa reported her molestation in California to the San Francisco police on September 27, 2007. The complaint against Lewis was filed on December 3,

2007, within one year of Teresa's report. The jury was instructed: "If you find . . . the defendant guilty of any of the counts [involving Teresa] . . . , you must further determine as to each count . . . whether the People have proved all [of] the following by a preponderance of the evidence: [¶] One, on September 27, 2007, Teresa C. first reported to a California law enforcement agency that while under the age of 18, she was the victim of lewd and lascivious acts upon a minor under 14; [¶] Two, a complaint accusing the defendant of the crimes [against Teresa] was filed on or before September 27, 2008. . . . "

The accuracy of the court's instruction is a question of statutory interpretation that we review de novo. (*People v. Sisuphan* (2010) 181 Cal.App.4th 800, 806.) "In construing a statute, '[t]he fundamental rule is that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' " (*Ibid.*) According to the legislative history, section 803, subdivision (g)(1) was enacted in 1994 out of concern that " '[c]hild sexual abuse cases frequently come to the attention of law enforcement wherein the victim, now an adult reveals that [he or she] had been sexually abused as a child. . . . However, due to the statute of limitations, a case of this sort cannot be pursued in criminal court unless the crime was committed within six years of the disclosure.' " (*Ream v. Superior Court* (1996) 48 Cal.App.4th 1812, 1820–1821.) This legislative intent to effectively extend the statute of limitations in child molestation cases would not be furthered by a literal interpretation of the 1994 statute because California law enforcement authorities may never learn of, and be able to act on, reports by victims to law enforcement in other jurisdictions. We therefore independently agree with the trial court's construction of the statute.

Lewis notes that the 1994 version of section 803, subdivision (g)(1) is unambiguous and that, when a statute's language is clear, the plain meaning ordinarily controls. (*People v. Sisuphan, supra,* 181 Cal.App.4th at p. 806.) He further observes that statutory amendments are ordinarily considered to change the meaning of the law. (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 226.) In this instance, however, those rules of construction must yield to the more fundamental rule requiring that statutes receive a reasonable, practical construction consistent with their apparent purpose. (See

6

*People v. Zambia* (2011) 51 Cal.4th 965, 972; see also *People v. Robertson* (2003) 113 Cal.App.4th 389, 393 [" '[w]hile an intention to change the law is usually inferred from a material change in the language of the statute [citations], a consideration of the surrounding circumstances may indicate, on the other hand, that the amendment was merely the result of a legislative attempt to clarify the true meaning of the statute' "].) The People's critique of Lewis's argument is entirely persuasive.

Additional support for our conclusion appears in the 1994 version of section 803. Subdivision (f) stated:  "Notwithstanding any other limitation of time described in this section, a criminal complaint may be filed within one year of the date of a report to a *responsible adult or agency* by a child under 18 years of age that the child is a victim of a crime described in Section . . . 288 . . . .  [¶] For purposes of this subdivision, a 'responsible adult' or 'agency' means a person or agency required to report pursuant to Section 11166. . . . "  (Stats. 1993, ch. 390, § 1, p. 2225.)  The cross-reference to mandated reporters who come within section 11166 in the second quoted paragraph makes it clear that the words "responsible adult or agency" in the first paragraph meant a "responsible *California* adult or agency," because California has no authority to mandate reports by adults or agencies in other states.  (See *Bonaparte v. Tax Court* (1881) 104 U.S. 592, 594 ["[n]o state can legislate except with reference to its own jurisdiction"]; *Bigelow v. Virginia* (1975) 421 U.S. 809, 824 [a state does not have "power or supervision over the internal affairs of another state"].)  The modifier "California" was implicit in subdivision (g)'s reference to "law enforcement agency," just as it was implicit in the reference to "responsible agency" in the first paragraph of subdivision (f), because subdivision (g), like subdivision (f), was likely referring to agencies under California jurisdiction.  (See *McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 [the words in a statute " 'must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible' "].)

The legislative history lodged in the trial court of the 1997 amendment to section 803, subdivision (g)(1) further supports our conclusion.  Addition of the word

7

"California" in subdivision (g)(1) was not discussed, indicating that the change was not considered material. (See, e.g., Sen. Com. on Public Safety Bill Analysis of Assem. Bill No. 700 (1997-1998 Reg. Sess.) as amended June 3, 1997.)

For these reasons, we conclude that the jury was correctly instructed on the statute of limitations.

B. <u>Denial of Due Process (Teresa)</u>

Lewis moved in the trial court to dismiss the charges involving Teresa, arguing that the lapse of time between the crimes and the filing of the complaint deprived him of due process. The court denied the motion on the ground that any delay was not caused by any state action. Lewis maintains that the court erred in denying the motion, and that we must independently review the ruling because it was based on the wrong legal standard.

"Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." (*People v. Catlin* (2001) 26 Cal.4th 81, 107.) "Even a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 915.)

We will assume for purposes of our analysis that due process can be denied by a delayed prosecution even if the state is not responsible for the delay, that the court thus applied the wrong standard when it denied the motion to dismiss, and that this error requires us to review the ruling on the motion de novo. Exercising that review, we conclude there was no deprivation of due process. The delay in this case was fully justified. The 1989 crimes were not reported to California law enforcement until 2007, and the prosecution was initiated promptly after the report was made. Consequently, a

8

very strong showing of prejudice was required (*People v. Dunn-Gonzalez, supra,* 47 Cal.App.4th at p. 915), and Lewis has not made one.

Lewis argues that he was prejudiced by the loss of the child welfare agency, police, prosecution, and court records of his 1991 Texas indictment and related investigation because those records "would plausibly have shown that the statute of limitations had expired." However, as we have explained, Lewis would not have been assisted by records showing that Teresa reported the abuse she suffered in California to Texas law enforcement in 1991 because a report to California authorities was required to trigger the running of the statute of limitations in section 803.

Lewis argues in his reply brief that the lost records might have contained information he could have used to impeach Teresa's testimony about the molestations she suffered in Texas. He notes that "[d]espite Teresa describing years of abuse in Texas from the witness stand, the Texas grand jury indictment against [him] contained only one charge: a single count of penetration." He continues: "Had the Texas grand jury heard a story remotely similar to the one heard by [his] California jury, [he] would have been charged with more than a single Texas crime. [¶] Likewise, were the transcripts for the Texas grand jury and the Texas police reports still in existence, [he] would have most likely been able to undermine Teresa's credibility with the discrepancies between the different versions of her story." He argues that he was prejudiced because "Teresa's credibility as a witness depended on the jury believing her entire story. Being able to discredit the Texas part of her testimony would have also caused the jury to doubt the San Francisco part of her testimony."

The problem with this line of argument is that it is wholly speculative. Our Supreme Court has repeatedly found speculative arguments inadequate to establish the actual prejudice required for delayed prosecution to constitute a due process violation. (*People v. Jones* (2013) 57 Cal.4th 899, 923; *People v. Abel* (2012) 53 Cal.4th 891, 909; *People v. Alexander* (2010) 49 Cal.4th 846, 875–876.) Since the delay in prosecution was completely justified and the possible prejudice was entirely speculative, the

9

justification for delay outweighed the possible harm and the motion to dismiss for deprivation of due process was correctly denied.

C. Exclusion of Credibility Evidence (Angelina)

(1) *Introduction*

Lewis argues that the court erred in excluding evidence involving Angelina's possible molestation by his sons, J.L. and N.L.

The defense obtained records pertaining to Angelina from an earlier juvenile proceeding. Those records included a report by a psychotherapist that indicated in December 2007, just four months after she accused Lewis of molesting her, Angelina said that his sons J.L. and N.L. had done "nasty things" to her. In August 2007, the eldest of the boys, J.L., was nine years old. A hearing was held on the admissibility of evidence of Angelina's prior sexual conduct. In that hearing, Angelina testified that doing "nasty things" meant things that were "mean" or "disgusting" such as "touch[ing] your privates." But she also testified that she could not recall that J.L. and N.L. had done any such things or that she ever reported that they had. At the end of the hearing, the court ruled preliminarily that Angelina's possible false allegations of abuse would be admissible subject to consideration of Evidence Code section 352.

(2) *The Excluded Evidence*

During a break in Angelina's cross-examination at trial, her guardian appeared and asserted on her behalf the therapist-patient privilege against admission of her report of abuse by J.L. and N.L. The prosecutor agreed that Angelina could be cross-examined about abuse by J.L. and N.L., "subject to a motion to strike . . . if the Court later finds that that evidence should not be admissible for whatever reason . . . ." Angelina was asked whether the boys had ever touched her privates or done anything nasty to her, and testified that she did not remember.

Evidence of possible abuse by the boys was further addressed in a hearing before the defense rested its case. Family therapist Ilene Yasemsky appeared with counsel and produced "suspected child abuse reports" dated December 7 and 12, 2007, which the court filed as sealed Court Exhibit 1. The December 12 document stated: "Angelina

10

reported . . . that Mr. Lewis' sons, [N.L.] & [J.L.], also did 'nasty things' to her like Mr. Lewis. She said she told her foster mother, Lynette Palmer ("Nanny") . . . it had been happening for a long time & that she was afraid to tell (because she might get in trouble)." After reviewing the documents in camera, the court advised that it found a report, presumably the one just quoted, to be "relevant to the issues that . . . were the reasons [the defense] subpoenaed Ms. Yasemsky," and noted that Yasemsky was asserting the therapist-patient privilege to exclude the report.

Also present at the hearing was counsel for J.L., who appeared for N.L. as well as J.L. He moved to quash defense subpoenas of both minors. The motions to quash were supported by declarations from the minors' therapists, filed under seal, opining that the minors should be found to be unavailable as witnesses because of the psychological damage they would suffer if they were required to testify. Counsel advised that he would instruct J.L. to "assert his Fifth Amendment right" against self-incrimination "[i]f questions are put to [J.L.] regarding any sexual contact with anyone." The court asked whether "the reason you are asserting the privilege is that you feel that there may be items that would incriminate your client?" and counsel answered, "Correct." Counsel indicated that N.L. would also be invoking his privilege against self-incrimination.

The court initially thought that Lewis's right to confront witnesses might outweigh any privilege against disclosure of Yasemsky's report, at least if the allegations in the report were false. But the court noted that J.L. and N.L. "would likely be [asserting] a Fifth Amendment privilege," and reasoned that Yasemsky's report had little or no probative value under Evidence Code section 352 without the minors' testimony. Lewis's counsel "remind[ed] the Court that we had actually offered the allegation by Angelina under two theories of relevance: [¶] One, that it was false. [¶] And, two, that the fact that she didn't even remember making the allegation and couldn't say whether they had or they had not, in fact, touched her went to her memory and her truthfulness and her character as a witness, which I think, therefore, that does not implicate [N.L.] and [J.L.]." Defense counsel also "obect[ed] to the Court considering a Fifth Amendment privilege which hasn't been invoked as part of the 352 analysis." The prosecutor agreed

11

that "it would be error to consider the Fifth Amendment privilege until it is actually invoked . . . [¶] . . . on the stand, " and until that time "you can't consider [the privilege] for 352 analysis." However, looking at the issue from "a commonsensical point of view," the court found that the Fifth Amendment privilege "would apply," and decided "to stick with my inclination. This is overruling both parties. [¶] Given . . . the assertion or the characterization of the accusation as false, given the right of the District Attorney to cross-examine whether it is false or not, given the assertion [of the Fifth Amendment privilege] that I anticipate or that I've been advised by counsel that will follow, given the significant trauma that would be visited on the minors if they were called to testify, I am going to find that the probative value of the statement, of the accusation does not outweigh [its prejudicial] effects."

The court further articulated its decision as follows: "I find that the probative value of [the] evidence [offered by the defense to impeach Angelina] is diminished and is outweighed by the efforts, one, to get it in. [¶] And, two, the significant impact of that probative value given what will come in in response to it."

In the wake of this ruling, the court granted the prosecutor's request to strike Angelina's testimony about possible abuse by J.L. and N.L. "from the record so it does not become part of any readback."

(3) *Review*

Lewis contends that the court erred in excluding evidence that his sons possibly abused Angelina, and that he was prejudiced by the error because the evidence was relevant to her credibility. He argues: "If [N.L]. or [J.L.] were to testify that they had sexual contact with Angelina, it would have impeached Angelina's credibility by directly contradicting her testimony that she did not have any sexual contact with them. If [N.L.] and [J.L.] had testified that they never had sexual contact with Angelina, then [he] could have called Ilene Yasemsky who reported Angelina's allegations that [N.L.] and [J.L.] had done nasty things to her. This testimony would have impeached Angelina by showing that she made false allegations of sexual assaults or molestations."

12

This reasoning does not undermine the trial court's determination that the probative value of Angelina's report of abuse to Yasemsky hinged on further evidence from J.L. and N.L. that bore on the veracity of the report. Lewis argues that the trial court erred in finding that the boys could avoid testifying by invoking their privilege against self-incrimination, but he identifies no persuasive basis on which their testimony could have been compelled had they asserted that privilege. Thus, even if the court was premature to analyze the admissibility of their testimony before they took the stand, no error resulted from the ruling.

Lewis argues that he was entitled to require that the court grant the boys judicial use immunity for their testimony because their testimony was necessary for his defense. However, a defendant's "constitutional rights to confrontation and to present a defense" do not " 'trump [a witness's] right to remain silent.' " (*People v. Smith* (2007) 40 Cal.4th 483, 521; see also *In re Williams* (1994) 7 Cal.4th 572, 610 [while judicial use immunity may be conferred in "special cases," it is not available when the testimony " ' "relate[s] only to the credibility of the government's witnesses" ' "].)

Lewis contends that the boys were not entitled to assert the privilege against self-incrimination because it was unlikely they'd be prosecuted for their testimony. In support of that argument, he observes that authorities had not acted on Yasemsky's report of Angelina's allegations against J.L. and N.L., which was made in 2007, years before the 2011 trial. He notes also that any abuse the boys admitted occurred when they were under the age of 14, and could be presumed to be incapable of committing a crime. (Pen. Code, § 26 ["[a]ll persons are capable of committing crimes except . . . [¶] . . . [c]hildren under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness"]; *Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 862.)

We conclude that the boys had the right to invoke the privilege. The privilege against self-incrimination " 'must be accorded liberal construction in favor of the right it was intended to secure.' " (*People v. Smith*, *supra*, 40 Cal.4th at p. 520.) "In assessing whether the court [could] properly allow [a witness] to invoke the privilege against self-

13

incrimination, we need not decide whether his testimony actually would have incriminated him, but rather whether it would have given him 'reasonable cause to apprehend *danger* from the testimony.' " (*Ibid.*) The boys could reasonably believe they would be at risk of prosecution if they admitted molesting Angelina. Accordingly, the court correctly anticipated that the testimony Lewis hoped to elicit could not be admitted.[2]

Nor are we persuaded that exclusion of the boys' testimony was prejudicial. J.L.'s counsel advised that testimony about his client's sexual activity might be incriminating, and that N.L.'s counsel's "position is identical to mine." Thus, if the boys were forced to testify on the subject, they would likely have admitted sexual activity with Angelina. Lewis claims that such testimony would have impugned Angelina's credibility because she testified that she did not have sexual contact with them. But all she said was that she could not recall such contact, not that it never occurred. Rather than impugn her, admissions that the boys molested Angelina would have bolstered her credibility because it would have shown that her 2007 report of that abuse was truthful. On the other hand, if the boys denied abusing Angelina after "taking the Fifth," their testimony would likely have been greeted with some skepticism.

Lewis asserts that "the proffered evidence was not just the heart of [his] defense; it was his entire defense to [the count involving Angelina]." But even though the charge hinged on Angelina's credibility, Lewis had multiple grounds to challenge the veracity of her reports at age six without delving into her allegations against J.L. and N.L. For example, during her August 2007 interview, she repeatedly said that Lewis molested her every time she went to his house. At trial, she said that he abused her only four or five times. She told the interviewer that she screamed and hollered when Lewis molested her,

---

[2] In view of our conclusion that the boys could exercise their privilege against self-incrimination, we need not decide whether the court correctly determined that they were unavailable as witnesses because of the trauma they would suffer from testifying (Evid. Code, § 240, subd. (a)(3)), or correctly excluded their testimony under Evidence Code section 352.

14

but she did not say that at trial. She testified at trial that Palmer's other foster children were at Lewis's house, where they could have been expected to hear her screams when Lewis molested her. Angelina admitted lying in her 2007 interview. At several points in the interview she said that she forgot what Lewis had done to her. She said at trial this was not true, and that she claimed to have forgotten what happened because she was nervous talking about it. Angelina also admitted lying to Palmer when she lived with her: "Q. Angelina, when you lived with Nanny [Palmer], did you ever lie about anything with her? A. Yes. Q. And what kind of things would you lie about? A. I don't remember."

Exclusion of credibility evidence does not implicate a defendant's constitutional rights unless the evidence would have produced a significantly different impression of the witness's veracity. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 494.) Given the jury's opportunity to observe Angelina's demeanor on the witness stand and at her videotaped 2007 interview, the inconsistencies in her accounts of what transpired with Lewis, and her admitted prevarications, evidence of her possible abuse by J.L. and N.L. would not have created a significantly different impression of her credibility. Any error in excluding the evidence was one of state law only, and it is not reasonably probable that admission of the evidence would have changed the result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Consistent with our conclusions that excluding the J.L. and N.L. evidence was neither erroneous nor prejudicial, we reject Lewis's contention that his trial counsel was incompetent for failing to make all of the arguments challenging its exclusion that he raises on appeal. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [different result must have been reasonably probable absent counsel's failings].)

D.  Propensity Evidence

To preserve the argument for federal court review, Lewis contends that Evidence Code section 1108, which permits the use of a defendant's other sex crimes to show a propensity to commit such crimes, and the related standard jury instruction (CALCRIM No. 1191), are unconstitutional. He recognizes that this same challenge to the statute was rejected in *People v. Falsetta* (1999) 21 Cal.4th 903, 907, and that we are required to

15

follow that decision. We are also bound to follow our Supreme Court's decision approving a standard instruction with essentially the same language as CALCRIM No. 1191. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009, 1011–1012 [considering the 1999 version of CALJIC No. 2.50.01].) Accordingly, we reject Lewis's challenges to the statute and instruction.

E. <u>Restitution</u>

Lewis contests the victim restitution he was ordered to pay Angelina and Teresa.

(1) *Record*

After Lewis was sentenced to prison, the prosecution filed a "motion for restitution for noneconomic damages" to the victims, seeking $1,179, 261 for Teresa and $287,253 for Angelina. Lewis filed a reply, arguing that restitution for Teresa was limited to $10,000 under the law in effect when the crimes against her were committed, and contesting the amount of noneconomic damages being claimed for Angelina. The prosecution thereafter filed a report from Lisa M. Murphy, Ph.D., a "trauma specialist," setting forth her opinions on the victims' economic damages. The report included "life care plans" identifying therapy and other services each victim would need due to Lewis's abuse. The report concluded that Teresa's services would cost $253,200, and that Angelina's services would cost $197,200. In a subsequent filing, the prosecution adjusted Murphy's calculations for the cost of the services, and claimed economic damages totaling $287,000 for Teresa and $273,400 for Angelina. The defense filed no response to the prosecution pleadings for economic damages.

At the restitution hearing, defense counsel noted that Lewis was "not here," and said, "There's nothing for me to say." The court ordered Lewis to pay Teresa $903,000 in restitution, consisting of $619,000 in noneconomic damages and $287,000 in economic damages. He was ordered to pay Angelina $678,400 in restitution, representing $405,000 in noneconomic damages and $273,400 in economic damages.

According to the November 2011 probation report, Lewis was 50 years old, had been employed as a janitor and as a union member in construction, and had no assets.

(2) *Review*

16

(a)  <u>Lewis's Absence from the Hearing (Teresa and Angelina)</u>

Lewis contends and the People agree that the court erred when it ordered him to pay restitution at a hearing he did not attend.  The People do not dispute that a defendant has the right to be present when sentence is imposed (see *People v. Rodriguez* (1998) 17 Cal.4th 253, 257), or that victim restitution is part of a defendant's sentence (*People v. Smith* (2011) 198 Cal.App.4th 415, 434).  Nothing in the record indicates that Lewis waived his right to be present at the restitution hearing.

However, even if the error was of constitutional dimension, we conclude that his absence was harmless beyond a reasonable doubt.  " 'Defendant has the burden of demonstrating that his absence prejudiced his case' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 799), and Lewis makes no attempt to carry that burden here.  He argues instead that the error was structural and thus per se reversible.  (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.)  However, structural error is limited to a handful of situations where the prejudice it causes cannot be determined.  (See *Johnson v. U.S.* (1997) 520 U.S. 461, 468–469 [citing "a total deprivation of the right to counsel" and "lack of an impartial trial judge"]; *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310 [distinguishing errors in the "trial process" from errors "affecting the framework within which the trial proceeds" that "defy analysis by 'harmless-error' standards"].)

Apart from his absence at the hearing, the errors Lewis alleges with respect to victim restitution concern the prohibition against ex post facto laws, the distinction between reasonably foreseeable and unduly speculative damages, and the need to account for the time value of money in awarding damages for future losses.  Since all of these legal arguments could have been effectively advanced by competent defense counsel without input from Lewis, this is not a situation where the prejudicial effect of his absence is impossible to discern.  There is no realistic prospect that his presence could have changed the outcome, and the claim of structural error must be rejected.  The error of proceeding in Lewis's absence was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

17

(b) <u>Ex Post Facto Argument (Teresa)</u>

Lewis contends that the amount of victim restitution awarded to Teresa should have been limited by the law in effect in 1989, when he committed his crimes against her.

Under current law, a victim of a section 288 crime like Teresa could receive $903,000 in restitution as she was awarded. Subdivision (f)(3) of section 1202.4 provides for restitution in "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as a result of the defendant's criminal conduct," and subdivision (f)(3)(F) of that statute provides for restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." (See also Cal. Const., art. I, § 28, subd. (b), para. 13 [expressing the "unequivocal intention" that all persons who suffer losses as a result of criminal activity receive restitution in every case].) However, before 1990, the law authorized victim restitution only for economic losses, and capped the recovery at $10,000. (*People v. Zito* (1992) 8 Cal.App.4th 736, 740 & fn. 2 [quoting former Gov. Code, § 13967, subdivision (c)].)

Lewis argues that awarding more than $10,000 to Teresa as now allowed under section 1202.4, subdivision (f)(3) violated the prohibition against ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) " '[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.' [Citation.] A law imposes a prohibited disadvantage if it . . . inflicts a greater punishment for the crime than was available when the crime was committed . . . .' [Citations.]" (*In re K.J.* (2014) 224 Cal.App.4th 1194, 1203.) Section 1202.4, subdivision (f)(3) is being applied retroactively in Lewis's case because it changed the legal consequences of the crimes he committed before its effective date. (*Ibid.*) The question is whether victim restitution constitutes "punishment" for ex post facto purposes.

That answer turns initially on legislative intent. (*In re K.J., supra,* 224 Cal.App.4th at p. 1203.) Punishment is not the principal aim of victim restitution. "The

18

primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime." (*People v. Harvest* (2000) 84 Cal.App.4th 641, 648.) The defendant's ability to pay the award is irrelevant. (*People v. Draut* (1999) 73 Cal.App.4th 577, 582.) But even if victim restitution is not intended as punishment, the ex post facto rule would prohibit retroactive application of a change in the law if the amendment is in effect punitive. (*In re K.J., supra,* 224 Cal.App.4th at p. 1203.) The punitive effect of removal of the $10,000 cap on victim restitution is well-illustrated in this case. The amendment opened the door to nearly a million dollars of additional liability—close to a 100-fold increase over the prior limit. We conclude that the ex post facto doctrine precludes an award of more than $10,000 in victim compensation to Teresa.

The same conclusion was reached in *People v. Zito, supra,* 8 Cal.App.4th 736. The defendant in *Zito* was ordered to pay the victim $300,000 in restitution for crimes he committed between November 22, 1988, and April 30, 1990. The change in the law eliminating the $10,000 limit on restitution and permitting recovery for the full amount of the victim's economic losses became effective on January 1, 1990. (*Id.* at pp. 740–741.) The court held that victim restitution was punitive for ex post facto purposes, and that the restitution order was unlawful to the extent it applied the then-current law to the pre-1990 crimes. (*Ibid.*) The court therefore remanded the case for a hearing to determine which losses occurred before 1990. (*Id.* at p. 742.)

The People cite *People v. Kunitz* (2004) 122 Cal.App.4th 652, and *People v. Harvest, supra,* 84 Cal.App.4th 641, to support a contrary conclusion. However, neither of these cases addressed the ex post facto doctrine. *Kunitz* held that a restitution fine could not be imposed on two defendants jointly and severally. (*People v. Kunitz, supra,* 122 Cal.App.4th at p. 654.) *Kunitz* distinguished cases permitting imposition of joint and several liability for victim restitution on the ground that, unlike a restitution fine, "which relates to the defendant's individual culpability," victim restitution "is not punishment." (*Kunitz*, *supra*, at p. 657.) *Kunitz* relied entirely on *Harvest* for this conclusion. (*Ibid.*) In *Harvest*, a divided court held that double jeopardy did not prohibit an increase in

19

victim restitution following a retrial after an appeal. (*People v. Harvest, supra,* 84 Cal.App.4th at p. 645.) To the extent the reasoning in *Harvest* may be relevant here, we agree with the dissent in that case. (*Id.* at p. 656, dis. opn. of Poche, J. [the punitive effect of victim restitution "renders it a criminal punishment"].)

Accordingly, the victim restitution to Teresa is limited to economic damages and must be reduced to $10,000. As discussed below, Lewis maintains that the restitution awards improperly included amounts for speculative future losses. This argument calls portions of Teresa's $287,000 economic damage award into question, but it does not effectively raise any doubt that she is entitled to economic damages of at least $10,000 as a result of Lewis's conduct.

(c) Angelina's Award

Lewis objects to the restitution to Angelina for future economic damages on the grounds that the award included losses that were merely speculative, and failed to account for the time value of money. (See *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172 [restitution order is intended to compensate the victim for actual losses, not to provide the victim with a windfall]; *People v. Pangan* (2013) 213 Cal.App.4th 574, 582 [current payment for future losses "must be discounted to reflect the fact the recipient is receiving the money now"].) Lewis forfeited these arguments by failing to raise them in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 353 [the defendant must object to the trial court's discretionary sentencing choices]; see *People v. Giordano* (2007) 42 Cal.4th 644, 663 [the trial court exercises discretion in calculating the amount of restitution].)

However, the People concede that Lewis's counsel should have argued that the restitution ordered for future losses be discounted to present value as explained in the *Pangan* case, that Lewis was prejudiced by counsel's failing, and that he is entitled to a new restitution hearing. The People do not respond to Lewis's argument that his counsel was also ineffective in failing to argue that some of the future damages awarded were unduly speculative.

20

Murphy recommended, among other things, weekly sessions of psychotherapy for Angelina during five two-year periods, beginning "as soon as possible," and resuming during adolescence, college, "at the time of marriage or entering into a significant relationship," and "during child bearing years." Lewis maintains that Murphy was merely speculating about Angelina's possible future expenses in opining that she would need psychotherapy in college to "offset any *possible* learning disabilities," and in her child bearing years because "[t]hose times *could* retrigger feelings regarding the abuse." (Italics added.) He also submits that Murphy was simply speculating about the costs Angelina would incur for psychiatric intervention and related medication because Murphy stated only that psychiatric intervention "*may* be required to help with depression and anxiety," and that Angelina "*might* be on medication for up to five years." (Italics added.)

Lewis further contends that the prosecution's addendum to Murphy's report, which purported merely to "correct" the report's erroneous mathematical calculations, unreasonably inflated the cost of the services Angelina allegedly needed. Murphy opined that Angelina should receive survivor group therapy and family therapy, as well as individual psychotherapy, once a week for periods of years. In calculating the cost of those therapies, Murphy assumed that there would be 48 sessions per year. The prosecution recalculated the costs based on 52 sessions per year. Lewis argues that it was unreasonable for the prosecution to assume that no weekly session in a year would ever be missed. It also appears that, unlike Murphy, the prosecution added costs for cognitive behavioral therapy that Murphy recommended only on an "as-needed basis."

Lewis has identified colorable objections to the amounts claimed for Angelina's economic damages that should have been made in the trial court. In the absence of an objection, the court understandably accepted the prosecution's numbers. Trial counsel had no tactical reason for failing to make the arguments Lewis now raises, and Lewis was prejudiced by the omission because we cannot be confident that the omission had no material influence on the outcome. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

21

The economic damages component of Angelina's restitution order must therefore be reversed.

The noneconomic damages Angelina was awarded were based in part on her economic damages. The court determined that she was entitled to compensation for 15 years of pain and suffering, from age six to age 21. The court decided that her compensation should be $27,000 per year, because that amount was "10 percent" of her total economic damages of $273,400. Since the economic damage award influenced the amount of the noneconomic damages, reversal of Angelina's economic damage award dictates that her noneconomic damage award also be reversed. Thus, the entirety of the restitution award to Angelina must be reconsidered. We hope that upon remand, the parties can agree on the amount of restitution and thereby avoid another hearing.

### III. DISPOSITION

Lewis's convictions are affirmed. The amount awarded in the order for restitution to Teresa is reduced to $10,000, and the order is affirmed as so modified. The order for restitution to Angelina is reversed, and the case is remanded for a new hearing on the amount of restitution to which she is entitled.

_____

Siggins, J.

We concur:


_____

McGuiness, P. J.


_____

Pollak, J.


*People v. Lewis*, A134995, A137530

23

| | |
|---|---|
| Trial Court: | City and County of San Francisco Superior Court |
| Trial Judge: | Honorable Newton J. Lamb |
| Counsel for Defendant and Appellant: | John Wilder Lee, in association with the First District Appellate Project |
| Counsel for Plaintiff and Respondent: | Kamala D. Harris, Attorney General |
| | Dane R. Gillette, Chief Assistant Attorney General |
| | Gerald A. Engler, Senior Assistant Attorney General |
| | Rene A. Chacon, Supervising Deputy Attorney General |
| | Linda M. Murphy, Deputy Attorney General |